If I may reserve four minutes of my open chip for rebuttal. Okay, thank you. Please watch the clock. I will. Or do my best, I should say. May it please the Court. My name is Richard Winery. I represent Pfaendler. After the strong exculpatory evidence developed in the officer's investigation smothered the probable cause to believe that Freedom Pfaendler knowingly remained in a Walmart where he had purchased and paid items and was attempting to leave, that he knowingly remained to finish those The officers made a decision not to arrest but to trespass Freedom Pfaendler. And had they just gone forward with that, we wouldn't be here today. Instead, the officers, after having trespassed Mr. Pfaendler and warned him, if you come back, you'll go to jail, sought to lecture him and chastise him. When they did not like his reaction, they took it as a slight to their personal dignity, huddled up, discussed him on one another in conversation that is recorded on their body cameras, where one asked the other, well, what do you want to do, arrest him? Well, I'm thinking about it with the way he's acting. And that is exactly what they then did. There were no facts whatsoever developed between when they made the decision and, in fact, trespassed Freedom Pfaendler and this moment. No new evidence building probable cause, whatever. The only thing that happened was they retaliated against him for the slight they perceived to their dignity. And in so doing, ran afoul of clearly established law here in the Ninth Circuit, specifically, Duran v. City of Douglas and Nicholson v. City of Los Angeles. Your Honors, the brief from the Tana Sarita attempts to set this case in the context of a horrible crime in the city of El Paso a few days before Freedom Pfaendler was taken to jail. And put in the context sought by the town, it adds a grim, dystopian tint to everything that happened in that Wal-Mart. But what happened was, on the body cam, it shows the store manager telling the officers that he had asked Mr. Pfaendler to leave multiple times. And I think I understand your argument to say that because Mr. Pfaendler said I couldn't hear him, that was his defense, that meant there was no probable cause, even after the manager repeatedly told the officers, yes, I told him to leave and he didn't leave. Judge Bate, that's exactly what the manager said, although his version of it and his emphatic nature of expanding on it increased each time he asked. However, the law of this circuit is that the officers have to consider exculpatory as well as inculpatory. With regard to whether or not Freedom Pfaendler saw the manager, as the manager claimed, we have pretty powerful evidence that the officers knew. When Officer George stepped in after talking to the manager, and you see it very clearly on the body camera, he addresses in a normal tone of voice to try and get Mr. Pfaendler's attention. Mr. Pfaendler is stuffing the items he had just paid for into his backpack in order to leave and get to work. But he did acknowledge that he saw the store manager. He said he saw him, and the manager said he followed him through half the store and was beside him and was trying to get his attention. And Mr. Pfaendler said, yes, I saw him. Well, first he said he didn't see him, then he acknowledged he did see him, but then said, well, he was speaking, but I thought he was talking on a headset. Okay. There are three parts of that, of seeing and hearing. But I guess I'm having a problem with the notion that if there's probable cause to believe a crime has been committed, that the officers then have to start weighing exculpatory or potentially exculpatory evidence and decide, well, we can't make an arrest. I mean, they're not trying the case. They're just deciding if there's probable cause, which is an incredibly low standard. Well, it is not a high bar. However, Nicholson makes it very clear, and the Court cites back to U.S. v. Ortiz-Hernandez for the proposition that the officers must take into account exculpatory as well as inculpatory evidence as they are making the probable cause determination. And if they ignore exculpatory, they're not entitled to rely Well, your description of exculpatory evidence is basically, this person says this, and this person says this. Are officers supposed to decide credibility? They may decide, gee, the manager, he doesn't have any reason to lie, and so he told us several times that your client didn't respond to my repeated efforts to get his attention and so forth. And it's true that the officer encountered the same thing, but why does that say that the officer should believe that your client wasn't oblivious because he just didn't care about what other people were doing, as distinguished one couldn't hear because he had his helmet on and was listening to music. And that's not the automatic reaction I would have or did have watching the body cam footage. Well, Judge Clift, there are two important things about your question. The first is what the officer knew, and as you alluded to, Officer George stands further back and then comes directly behind, and as you see on the video, Mr. Fandler doesn't see him, he does not hear him, so his point is that we don't know that from the body cam. We know that your client doesn't respond, but that doesn't mean he's not just blowing him off. Alright, with respect, I believe a fair viewing of it, and that's the great thing about having it, is that when George steps right behind him and uses a command voice, as police say, you see Fandler startle. He rears back, he whips his head around, he is clearly, I believe the inference, is surprised when he sees George behind him and did not know it before. Now Judge, you've had the right to read it or view it and draw your own, but I believe that's... But isn't the officer the one to observe and draw the conclusion? Yes. And that's why I have difficulty understanding how the officer went wrong by looking at the second question, officers are required to exercise judgment and discretion in deciding whether to act, in deciding whether to arrest based on probable cause. There are lots of drivers that exceed the speed limit and sometimes they get ticketed and sometimes they don't, but that doesn't mean that probable cause didn't exist. Well, as I say, the first element is what George saw happen right in front of him that we can see in the body camera, but the second is what officer George... The officer was standing behind Mr. Fandler and the store manager says, I was right next to him, I was in front of him, I was following him halfway through the store. This is not just a momentary encounter, this took some time. And again, two parts of that. The manager did claim he was following behind Mr. Fandler attempting to get his attention. And again, later when we see the video from the store, we see that that's what he was doing. He didn't come up alongside of him and he never, ever stood face-to-face to him. That never happened. So I think the difficulty I have with your argument is it suggests that we should resolve this factual dispute, whether Mr. Fandler saw the store manager, whether he saw the officer, when what the officers were relying upon was the manager's statement, I'm the store manager, I have authority over this premises, and I told him to leave multiple times and he didn't, when that would be probable cause for the violation of Arizona law. I don't deny the impact of an officer's getting a real-time report. Other circuits talk about when you have one accusatory witness, that's not been adopted here in this circuit, but what I'm saying is even here in the Ninth Circuit, the officers are required to look at the whole picture. But from Wesby, Wesby says, quote, probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts. And the reason for that seems pretty obvious. The officers aren't going to try the case at the spot. They're making a probable cause determination. I don't mean to suggest they have to do more, but Wesby also makes crystal clear that they must look at the whole story. They cannot break it down and divide and conquer on the individual facts. And again, what I want to stress is, not only is what the officers saw that Fandler wasn't able to see or hear what was happening behind him, so the manager following around and talking to him means nothing. The manager is not just following around. If the manager were just behind him, that might be — your argument might be plausible. But that's not what the manager said. The manager said, I was right beside him. And your client says, I saw him. And he says, I saw him, and I saw him talking. He had a headset on, which he did. And I thought he was talking on his headset, not to me. And the manager says, I followed him halfway around the store. And again, this is multiple, multiple places where he is trying to get his attention. And behind him — and again, the store camera surveillance video shows — But it's not that Mr. Fandler didn't see the manager. He said he did. So he's aware that the manager is with him halfway through the store trying to get his attention. That's not a guy on a headset just wandering around putting items back on shelves. We — there is nothing that the manager says or that — when Fandler says he saw him, he does see him when he is first walking in the store. The manager reaches out to give him a high five. Mr. Fandler walks right by him. That's the time. From that point forward until when the police cabbage onto him, there isn't any other statement by Mr. Fandler or — other than the claim by — there's nothing — no other statement by Mr. Fandler that he sees the manager — But what — it still comes back to the undisputed evidence, which is on the video, that the manager told the officers, I asked him to leave six times or so, and he didn't leave, which is probable cause for the trespass charge. Well, the second point I'm crawling to try and get to is not only do we have what the officers saw with Fandler, but the second part is what the officers did. After they heard Mr. Fandler consistently corroborate every statement he made about what he was doing in the store and what he was doing, the officers did not arrest him. They trespassed him. They did not find probable cause and sack him up for trespassing at that point. They trespassed him, got permission of the manager, went back and said, come back here again, you're going to jail. And then Officer George continues. He opened his salvo with Mr. Fandler by saying, you need to take both your hands, put them behind you, pull your head out of your ass, pardon me, and listen to what's going on. At the end, after they trespass him, they start lecturing him about El Paso. My client says, I don't know what you're talking about. He didn't know about El Paso. The officers don't like his response, and there's no new information or evidence gathered at this stage. It's just the officers want to teach him a lesson, give him it. If my client had given the right answers in the right way with the right respectful tone, we wouldn't be here. Well, that's what happens in a traffic stop. And the officer gauges whether or not this person is actually going to behave hereafter. And I've got to say, your client gave indication that he was going to continue doing things his way. So maybe that's why officers exercise the discretion, given that there was probable cause in their perspective, to say, well, this guy's not going to go off and obey or respond or pay attention to the rest of the world. He's going to keep doing things his way, so we need to take him in. Now, what's wrong with that? I'll tell you what's wrong with it is the holding of this circuit in Duran versus City of Douglas. Not exactly. Not only is that case old, but it's a different context. Well, the context is different, but the holding is identical, that police may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity. But the scenario I just outlined wasn't that. It's an officer exercising judgment that this person's not going to be responsive hereafter, and maybe this is the person that needs to be taught a lesson. Not because of feeling personally insulted or slighted, but because your client was not particularly responsive to the officers, just as the store manager said he wasn't at all responsive to him and seemed to be oblivious to the rest of the world. And I've got to say, he may be ignorant of El Paso, but at that point in time, to walk around dressed as he was, not paying attention to what else was going on, I could imagine Walmart employees would be on extreme edge. Well, they called 9-1-1. There was more than one 9-1-1 call. People were clearly on edge and frightened. And the evidence that developed in the record is there were multiple calls to 9-1-1 because the manager was telling his employees to call 9-1-1. So I want to go back to your argument about the officers only It seemed to me you were making a Ballantyne argument or Nevis, suggesting that officers can't arrest somebody in circumstances because they're exercising their free speech rights. And the examples are they don't really arrest people for jaywalking or chalking on the sidewalks, but they happen to arrest this particular person. But in those cases, and Nevis, the court said, you have to have objective evidence that they don't arrest other people. And I don't see anything in this record that would say officers don't arrest people for trespass. And this was an exceptional arrest. And so we can show that this was motivated by an attempt to suppress Mr. And I'm mispronouncing his name. Mr. Fandler's rights. Well, the difference and what makes this case maybe unique is we don't have to guess about what was going on. They trespassed him. They did not arrest him. Well, here's the problem with your argument. I don't know the statistics, but I would surmise that it's extremely common that when officers are arresting people or interacting with people, people swear at them, say bad things to them. They're drunk. I mean, I'm not saying any of that's happened here, but they encounter people misbehaving and people doing things that the rest of us would find insulting. But they arrest them anyway. And just because that has occurred doesn't mean we have to then decide they did this to suppress his rights. Okay. But we don't, again, we don't have to guess in this case, because what happened is Officer George told Mr. Fandler in one of his tirades at him, stop talking, ordered him stop talking. And that happened in another case this week. And the officers tell the person they're trying to deal with just to stop talking and listen. And then Officer Valenzuela starts asking biographical questions. Mr. Fandler literally raises his hand and points to George who just told him to stop talking. Yeah, this is a really, really silly bit of conduct by your client. It was really juvenile. And so if it insults the officers, yes, it insults the officers. But it also confirms what the manager had told the officers, that your client was willfully ignorant of everything that was going on. He was ignoring people and he was ignoring them deliberately. Didn't think he had to pay attention to the manager because he wasn't worth talking to. And he didn't want to talk to the officers. This was just a huge pain. And he just wanted to go on his way and do whatever he darn well pleased. The willful ignorance really, really comes through in that tape. He was making a game of it, right? When one officer tells you to stop talking and then the other one asks you questions to pantomime and act as he did. He was treating it as a game. I'm the father of an 18-year-old, so I have some sympathy for the reactions of a young person when you're trying to do them the solid of getting them to see the bigger picture as the adult world does. But the question, the very, very serious question before the court, and Judge Bybee, your reaction is exactly what Valenzuela said when Fanler engaged in that recording. So the serious question we have, though, is... Which tends to confirm what the manager said. That he treated him with disrespect, that he saw him, that he knew that the manager was trying to get his attention, and he was willfully ignorant of him. He willfully ignored him. And as Judge Clifton said, officers see these things and they're supposed to rise above them. And when we look at, was there evidence in that juvenile display that you've just described, Judge Bybee, which built probable cause for trespass? They had probable cause already. The question is, should they exercise their discretion? Did this person need some shaking up? And your client's behavior seemed to suggest, yeah, he wasn't going to pay attention unless I did something to really get his attention. I don't see anything that defeats the existence of probable cause. And the notion that there could be separately a cause of action for insulting a cop, retaliation, I don't know. I've heard what you've pointed to. It's hard to see from our perspective or, more importantly, from the perspective of a reasonable jury. Your client was simply non-responsive in a way that you would expect a better response. I understand the comment. I see that I'm substantially over my time. We've taken you there. We've taken you over time. I will give you some rebuttal time. But I do have a question for you. Yes, ma'am. You have a claim about the search of the backpack. Yes, ma'am. So does that rise or fall with your wrongful arrest claim? Well, we, again, obviously, if there is not probable cause, it's not a lawful custodial arrest. There cannot be a search of the backpack. Right. But if there was probable cause, then does your search claim fail as well? We argued earlier in the case that the search of the backpack was outside the scope, the location, because it had been separated from him. There's a procedural argument to make that that has been waived or lost in the hurly-burly that brings us here today. Since Belton was chopped back, we believe that that argument, with it in a de novo review, is there for the court to consider, that at the time they were separated, after that question was asked, that the backpack was nowhere near my client, he was clearly no threat, and that the search of the backpack was illegal. So I don't want to try and squiggle out of my procedural history, but that's the answer to your question. All right. Thank you. So I'll give you two minutes for rebuttal. That's more than fair. Thank you, Your Honor. Good morning. My name is Jim Jellison. I represent the Sahuita officers in this case. You know, I'll start with the backpack, since we ended with the backpack. One of the reasons that we offered in our supplemental excerpt of records was to point out two major things, one about the backpack and one that sort of permeated my colleague's comments to you about motivations and speech and conduct. So on the backpack, if you look at the record, and it goes, Judge Beatty, to your question, does that rise and fall on the probable cause issue? The answer is yes, because that's all that was raised at the lower court. Appellant's counsel never raised the idea that the backpack search was improper or illegal or unconstitutional for any reason other than if the arrest lacked probable cause, the search lacked probable cause. The only time that the lower court delved into the backpack search beyond the issue of probable cause was actually at the oral argument. And even after the oral argument, the judge still went back to two places on the backpack search. Number one, that the only thing the appellant raised in response to the backpack search was the probable cause issue, and since I find probable cause, then I defeat the only argument that you made. But supplementally, he said, it does not violate clearly established law to search the backpack if you have inquired with the appellant, hey, do you have any dangerous instrumentalities on you? And he says, no, but I can't speak for what's in the backpack. Now, these officers are going to transport that backpack, and the judge determined that they have a right to know what's in it when they do transport it. And at the very least, there was no clearly established law provided by the appellant, which is their burden to do, to show that the backpack search was unlawful and that every reasonable officer would know that. The next thing I want to talk about is the speech and conduct element. And again, one of the reasons that we have provided the complaint and the amended complaint in the supplemental excerpt of records is to show that there, in fact, is no First Amendment retaliation claim raised in this case. And all the arguments we've been talking about would be pertinent to that claim that wasn't brought. If a First Amendment retaliation claim had been brought, then the Duran case from the Ninth Circuit, which I believe was decided around 1980, would apply. Ninety. I was a decade off. It would apply, but the Duran case was truly a First Amendment retaliation claim. There was no crime there, and the officer reacted to the profanity and the display that Mr. Duran exhibited. And it was determined that Mr. Duran had a right under the First Amendment to say those things, and there was no other lawful reason to detain him and arrest him. That's not this case. And we can see that from the body-worn camera footage and the transcript and, frankly, all the undisputed evidence in this case. Now, we're in 2022, 23, 24. If there had been a First Amendment retaliation claim raised, then we would be viewing that under the lens of the U.S. Supreme Court's decision in the Evies v. Bartlett.  But if we got there, what the Evies instructs, and Judge Beatty, I think this is what you were driving at, is that probable cause is a defense to a First Amendment retaliation claim with one exception, and that one exception would be that the plaintiff could show that that agency and its officers would not normally arrest somebody for that offense. That was never developed in the record. So even if this was a First Amendment claim, even if it was brought under that particular legal theory, it would still have failed at summary judgment, and we shouldn't really even be talking about it now, because what we're here to consider is whether there are objective facts that support probable cause. What the officers felt, believed, what their subjective beliefs were, are immaterial. Frankly, we don't really know what they were, because they weren't deposed in the underlying case. We ended up submitting affidavits. It's just as logical to argue that, considering El Paso, that the officers looked at the behavior of Mr. Fainler, they looked at the probable cause that they had, and said it's best we remove him from this environment through an arrest. And, you know, we hear that all the time when these tragic cases occur, is that couldn't somebody have prevented this? Couldn't somebody have taken action? And in this case, the officers took action, and they still land in court. And for that reason, and of course in consideration of the clear legal propositions related to probable cause, that it's not a high bar, that it doesn't require you to assess credibility of reporting parties, it doesn't require you to hold a mini-trial to meet the standard. Probable cause is clear in this case. It's clear from Mr. Duran's testimony. But the subjective part... The heart of your opposing counsel's argument seems to be that the officers were given two he didn't leave, and Mr. Fainler saying, I didn't hear him, and that the officers should have weighed that or considered his exculpatory explanation before determining that probable cause. How do you respond to that? Broadly, I respond that it doesn't take away probable cause, and I'll explain why. But sort of as a secondary proposition, what they did here hasn't been shown to violate clearly established law or to take away from at least arguable probable cause, which is the qualified immunity standard. But the trial court found actual probable cause. So let's talk about actual probable cause. So the appellant enters into this Walmart three days after a mass shooting in helmet, full motorcycle regalia, boots, and a camouflaged backpack. The store manager saw that. After the fact, we all see it in the surveillance footage. The store manager in that surveillance footage attempts to contact him on multiple occasions. But what really matters is what the officers heard from the store manager and Mr. Fainler. So let's look at the transcript, because this is what the officers heard, among other things. Store manager Duran saying, he totally ignored me. I'm walking with him and say, quote, sir, can you please stop and address me, end quote. And he kept walking. Sir, I've got police officers. This is Duran to Mr. Fainler as it's being explained to the officers. Sir, I've got police officers coming out. I'm going to ask you to leave the store, end quote. And he kept going. Mr. Duran to Mr. Fainler in the presence of the officers, I'm standing right next to you, right next to you. I came right and I said, sir, I need you to stop. I said, stop. I said, stop. I followed you halfway through the store. I stood right in front of you, just like I'm standing here. I said, quote, I need you to stop and listen to me. Store manager, I've got associates that were upset and concerned because you're walking around with the backpack with a helmet and nobody knows who you are. And Officer George to the store manager, and this is right before the decision is made, the declaration that you're going to be arrested for trespassing. Officer George to the store manager, Mr. Duran, did you ask him to leave the store? Mr. Duran, five, six times, walked right next to him. So that's what they had from the store manager, Mr. Duran. In contrast, what did they have from Mr. Fainler? Mr. Fainler said two things. Hey, I was listening to music. I couldn't hear him. I saw him. I thought he was talking to somebody else. But I had my music on. The next thing was, Mr. Fainler, quote, I can't explain it, man. That's what he said to the officers. I can't explain it, man. So that's what the officers had from Mr. Fainler. What they had from their observations is that this man is in the store and he's dressed exactly like the 911 calls suggest. They go up to him and they're not standing right in front of him. We can see that on the video. And it takes them six seconds to grab his attention. Officer Rivera says, I need you to remove your helmet. And he immediately removes it. So from their experience, they can contrast a store manager who is walking halfway through the store, approaching him from the side, approaching him from the front. Fainler knows he's there and he admits it. And he just ignores him. Contrasted to the police officers, who he responds within six seconds and removes the helmet upon request. That would be enough to disregard this future defense. But mostly, and I think Judge Clifton, your questions go straight to this. If the officers have probable cause from Mr. Duran, and Mr. Fainler's explanations are more in line of a defense that doesn't seem to be credible based on their interactions with Fainler, they don't have to make a credibility determination in order to make an arrest. They have the authority to do it based on the probable cause that exists. And I hope I answered your question. Some of the other questions also go to it. Mr. Duran is complaining that this person is ignoring me. He's not responding to me. I'm clearly there in front of him. I'm talking loudly. I'm asking five or six times. And he ignores me. That's consistent with now what the officers are seeing from Mr. Fainler in terms of his interactions with the police officers. Once confronted and once told to listen, he's going to play the game with them and pretend like, hey, I'm not going to talk. I'm going to zip my lips and I'm not going to speak to you or I'm not going to deal with you, exhibiting the exact same behavior that Mr. Duran is complaining about. So if you even applied a balancing test to probable cause, which you shouldn't, the balance falls in favor of probable cause and making an arrest in this case. And that concludes my remarks, unless the panel has questions for me. All right. Thank you. Thank you. I take the questions the panel has asked to heart about the way the situation developed with the responses. But in making cold decisions without wanting to teach a young man a lesson about what were the facts the officers actually had in hand, they were provided a contact with a young man who, once he realized the officers were talking to him, was immediately compliant. He provided receipts to show where he bought it. He explained where he was going to work, that he was just in the store as he had been in that store, in other stores, dressed exactly the same way, without ever having this happen. Again, not knowing that El Paso had occurred three days earlier, which was the game changer here, unbeknownst to him. The simple fact is, the officers were seeing the manager up the ante on what my client had done in ways that, now that we see the video camera, were patently false. Granted, the officers would not have known that, because they did not ask what so often happens in Walmarts to see the surveillance video, which Mr. Duran testified in his deposition was a few minutes away. The officers did not ask, and granted, they wouldn't have had an affirmative duty to do so, but when we look at what the officers did in Westby, the repeated interviews of 21 people in the little strip club going on in Westby, none of that occurred here to test the conflicting stories between them. But we know that the officers resolved it by trespassing him, not by concluding they became offended at his responses to their effort to explain to him why he was in the wrong. So, your honors, I understand, and I absolutely take your point, that this could have been a judgment call the officers made in the discretion, but it also speaks to their using the authority of the badge and gun to teach a lesson that should not be taught. I want to make sure I understand the argument. So, if the officers had gone up to, had talked to the manager, let's say, separately, one officer is just holding your client without talking to him, one over is talking to the manager, and he comes back over and says, you know, we can arrest you, and you don't want that, and we don't need that trouble as well, and then your client started mouthing off to the officers. Do they lose the ability to be able to arrest him at that point because he's mouthing off, and now it looks like it's some kind of retaliation for your client exercising his First Amendment rights? Well, that seems to be the argument that you're making. It is not the argument I'm making. I understand the nature of the question. In this case, it wasn't a First Amendment right. It was his right to remain silent that they punished him for. They retaliated against. The officer's response, you're acting like a baby, was when Mr. Fandler, and it wasn't some grand invocation, it was he was complying with what Officer George had ordered him to stop talking. It's a pretty juvenile response. It was not one that I would want my son. And it's not one that you would have advised if you'd been standing at his elbow. I got that. But the language of Duran is that the officers got to rise above. Sure, but if the officer has probable cause, and I'm giving you a hypothetical in which they've advised him they can arrest him, do they lose the ability to arrest him simply because he starts mouthing off? No, but in this case, our argument is that they knew they did not have probable cause and had decided to not arrest him until they got mad at him, and then they pulled forward. The fact is that your argument is that they did not have probable cause and knew it. They did not have probable cause. If we conclude that there was probable cause, is there anything left to the argument? I'm in big trouble if you make a determination that they had probable cause. All right. Thank you, sir. I appreciate the courtesy of the Court. Thank you. This case is submitted. Counsel, thank you both for your arguments this morning. They were very helpful. And we are adjourned. Thank you.
judges: CLIFTON, BYBEE, BADE